Filed 2/9/15  P. v. Rivera CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESUS RIVERA,<br><br>Defendant and Appellant. | C066659<br><br>(Super. Ct. No. 08F08576) |

Defendant Jesus Rivera tried to kill his wife, Maria Contreras, on two separate occasions.  In 2006, he attacked her with a hammer.  In 2008, he shot her three times at close range.  Defendant did not dispute that he had committed these acts.  Rather, as to both attacks, he claimed he acted in the heat of passion, and at the time of the 2008 shooting, he was suffering from schizophrenia.  Following a jury trial, defendant was convicted of two counts of attempted murder with true findings that each of the attempts was willful, deliberate, and premeditated.  Defendant appeals these convictions, contending they must be reversed, because:  (1) the court erred in failing to instruct the

1

jury that if it found his mental illness negated premeditation, it could convict him of attempted murder rather than attempted premeditated[1] murder; (2) counsel was ineffective in failing to request an instruction that the jury could consider provocation in determining premeditation; and (3) counsel was ineffective in failing to request an instruction that the jury could consider defendant's mental impairment in evaluating the heat of passion claim and determining premeditation.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Charges, Allegations, and Pleas

Defendant was charged with two counts of attempted murder (Pen. Code, §§ 187/664 (counts 1 and 4)),[2] two counts of spousal abuse (§ 273.5, subd. (a) (counts 2 and 6)), assault with a deadly weapon, a hammer, (§ 245, subd. (a)(1) (count 3)), and assault with a firearm (§ 245, subd. (a)(2) (count 5)). As to each count, it was further alleged defendant personally inflicted great bodily injury under circumstances involving domestic violence. (§ 12022.7, subd. (e).) As to the 2008 attempted murder charge,

---

[1] Throughout defendant's briefing he uses the misnomer, "premeditated attempted murder." The sentencing enhancement under section 664, subdivision (a), requires that the attempted murder be "willful, deliberate, and premeditated." The most complex of these elements is deliberation, which requires that a defendant "carefully weigh[] the considerations for and against (his/her) choice and, knowing the consequences, decide[] to kill," while premeditation simply means that the defendant "decided to kill before acting." (CALCRIM No. 601.) Given the mens rea elements, it is more appropriate to refer to the crime of attempted murder plus the enhancement as "attempted willful, deliberate, and premeditated murder." In the instant case, it is undisputed that defendant intended to kill, i.e., that he acted willfully. As the challenge on appeal is apparently intended to relate to "deliberation" *and* "premeditation," we will occasionally refer to the combination of the crime and enhancement as "attempted deliberate and premeditated murder."

[2] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

spousal abuse charge and assault with a firearm charge, it was also alleged defendant had personally used and personally discharged a firearm and thereby proximately caused great bodily injury. (§ 12022.53, subds. (b), (c), (d).) As to both of the attempted murder counts, it was alleged that each was willful, deliberate, and premeditated. (§ 664, subd. (a).)

Defendant pleaded not guilty and not guilty by reason of insanity. He later withdrew his not guilty by reason of insanity plea after the verdicts in the guilt phase were recorded.

**Prosecution's Case in Chief**

Defendant and Maria were married for 18 years and have four children, Blanca, Guadalupe, Mayra, and Jennifer.[3] From the beginning of the marriage, defendant was jealous and accused Maria of being unfaithful to him. In addition, defendant was physically and verbally abusive to Maria. About five years into the marriage, he started telling her he would kill her if she left him. Maria lived in fear of defendant throughout their marriage.

In 2006, the family spent part of Christmas Eve at the home of Maria's sister, Candelaria. Defendant told Maria during the preceding week, a man had been calling him, telling him she was having an affair. According to Maria, this was something defendant always said to her. Despite defendant's complaint, Christmas Eve was a pleasant evening, everyone got along well and, according to everyone in attendance, defendant was behaving normally. When the family returned home, they watched a movie. According to Maria, when they returned home, defendant was "really calm" and "smiling." Defendant spoke with his daughters before bed. He gave them some advice -- to be good and to behave -- and he also told them he loved them very much. At that time,

---

[3] Many of the witnesses share surnames. To avoid confusion, we will refer to them by their first names.

he seemed anxious and not in control of his emotions. When he went to bed, he appeared normal. He was wearing shorts when he went to bed.

During the night, Maria, who is a light sleeper, awoke. Defendant, who was now dressed in a red T-shirt and pants, was standing in front of her and looking at her. She asked "him why he was standing up and dressed," and he said he could not sleep and had a headache. He asked her for some Tylenol that was on the side of the nightstand. She grabbed the bottle of Tylenol, gave it to defendant, and went back to sleep.

Later, Maria was again awakened. Defendant was straddling her, holding her down and hitting her on the head with a hammer. She lost consciousness. Defendant fled the apartment. The next morning, Christmas Day, Maria's daughters heard her calling out for them and found her lying on the living room floor, covered in blood. In the bedroom, they saw blood all over the bed and carpet and a bloody hammer on the bed. The front door had been closed and the dead bolt locked. To lock the door from the inside, one must turn a knob; to lock it from the outside, one must use a key. Both defendant and his truck were gone.

Maria was taken to the hospital where she was treated for a depressed skull fracture, cerebral contusions, a bruised chest wall, facial lacerations, and injured ligaments to her cervical spine. She was intubated and remained hospitalized for 10 days.

The hammer had been kept with defendant's tools in a closet in the living room or kitchen. Maria testified the hammer was not in the bedroom before she went to bed and it would have been unusual for defendant's tools to be somewhere in the house other than where he kept them. Guadalupe also testified that defendant never kept the hammer in the bedroom.

In January 2007, defendant surprised Maria's family by visiting the home of her mother in Mexico. While there, defendant told Maria's sister, Leticia, he had not meant to hit Maria, but he was "pretty sure" she was cheating on him with another man and that he was "very frustrated." He also complained that Maria would "get herself really made

4

up every time she went out." He said that on the night of the attack, after Maria had fallen asleep, a man had called the house at 2:00 a.m. claiming to be Maria's lover and threatening to take Maria away from him. Defendant said nothing to Leticia about seeing monsters in or on Maria at the time of the attack.

In 2007, Maria and her daughters moved to a mobile home. For a time after the attack, Maria and her daughters did not see defendant, but at various times, he spoke with some of them on the phone.

Defendant called and talked to Guadalupe while Maria was still in the hospital. He told her that he had been hallucinating and attacked Maria because he saw a monster in her. Approximately two years after the hammer attack, Mayra spoke to defendant on the phone. When Mayra asked defendant why he had done what he did to Maria, defendant told her he did it because he thought she was going out with another person. In a subsequent conversation, defendant gave Mayra a different reason for the attack; he said he saw a monster, but did not say where he saw the monster.

About a year after the family moved, defendant began living with Leticia in Sacramento. Leticia described defendant's behavior as normal while he resided with her. Leticia felt sorry for defendant because he seemed remorseful. He said he could not lose Maria and his family.

While defendant was living with Leticia, Blanca spoke with him at Leticia's home. Defendant started talking about what happened on Christmas Eve and said he saw the devil was on top of Maria and he wanted to kill the devil. He also said he assaulted Maria because she was having a romantic relationship with another man; "that she was having a romantic relationship and that the devil got involved." He also said Maria had left him because she had someone else and "jealous [*sic*] blinded" him. On a separate occasion, Jennifer spoke to defendant on the phone while defendant was living with Leticia. When Jennifer asked defendant why he did what he had done to Maria on Christmas Eve, defendant said he saw something on the bed. He did not tell Jennifer it

5

was the devil or a monster on the bed or that he did anything to "something on the bed." He just said he saw something on the bed.

Because defendant said he wanted to deliver Mother's Day flowers to Maria, Leticia told defendant where Maria was then living. Defendant showed up at Maria's house with a bouquet of roses asking for forgiveness. Over the course of the next few months, defendant repeatedly called the house and spent time there with their daughters. Most of the time when defendant called and Maria answered, she would hang up on him when she realized it was defendant calling. Defendant begged Maria to forgive him. Defendant also repeatedly told Maria he would kill her if she did not get back together with him.[4]

On September 16, 2008, the day of the shooting, defendant had lunch at Leticia's house earlier in the day. Leticia conversed with him at the table. She described defendant's behavior as normal.

Later that day, Guadalupe arranged to meet a mechanic at Maria's home. The mechanic arrived before Guadalupe, and Maria invited him inside and gave him a soda. Later, Maria went into the backyard to look for a tool the mechanic needed. While she was looking for the tool along the "edge" of the house, she noticed the doors to a tool shed located near where she was looking for the tool were ajar. She was about to open the doors when she saw defendant standing inside, crying and holding a gun. Maria tried to run, but she tripped and fell backwards. From a distance of four to five feet, defendant shot her in the chest. After firing the first shot, defendant told Maria he was not going to share her with anyone else. At some point during this attack, he also told her if he could

---

[4] After the first incident, law enforcement did not seek an arrest warrant because it was thought that they had insufficient identifying information. After defendant resurfaced, Maria called the police several times, informed them there had been a prior attempted murder report, but the police did nothing. Maria testified that she was told if defendant did not do anything, they could not go into the house and arrest him.

not have her, no one would and he would not rest until she was dead. Maria struggled to get up after being shot the first time and then tried to run, but defendant shot her twice more from behind. The bullets struck her in the back of the neck. Guadalupe heard the gunshots, ran to the backyard, saw her mother on the ground, and called 911. Defendant was not around.

Maria was taken to the hospital and treated for three gunshot wounds, one in her left chest and two in the back of her neck, near the base of the skull. She suffered a spinal fracture from one of the bullets and a severed artery. Maria was hospitalized for nine days. When she was discharged, she still had several bullet fragments in "her upper body and face."

Later on September 16, 2008, defendant called Juan Mendoza, a friend who lived in Fresno, and asked to come over. Defendant stayed at Mendoza's home for three to four days. Mendoza had known defendant for 20 years. Defendant did not leave the house while he stayed with Mendoza. During the "first days," defendant did not tell Mendoza why he was there. Defendant eventually told Mendoza he was in Fresno to sell his van and move to another state. He told Mendoza he had had an "accident" with his wife and tried to kill her because she was cheating on him. Defendant told Mendoza he had tried to kill his wife by shooting her. When asked how defendant was behaving during his stay, Mendoza only said, "[h]e was a little sad."

Mendoza's brother, Gilberto Mendoza Piedra, was also staying at Mendoza's house. Defendant sold Piedra his van for $1,000, $500 cash and $500 to be paid later. Defendant also gave Piedra a .22-caliber revolver and ammunition and asked Piedra to sell those items for him and send him the money.

Defendant told Piedra he was staying in Fresno because he was having family problems. Defendant said he had fought with his wife, but said nothing about her being seriously injured. When asked how defendant was behaving during his stay in at Mendoza's house, Piedra said, "[h]e seemed very serious, very deep in thoughts."

7

Mendoza took defendant to a bus station; during the ride there, defendant was acting normally. Defendant told Mendoza he was going to Washington State to work. Piedra later received a call from defendant, who asked for the remaining $500 Piedra had agreed to pay for the van.

Defendant was later arrested in Washington State. On October 21, 2008, two law enforcement officers escorted him back to Sacramento. Throughout the trip, defendant was lucid, followed instructions, and engaged in casual conversation. For example, when they stopped for a meal at a sandwich shop, defendant asked the Spanish-speaking officer where he was from and how the officer had learned Spanish. When the officer told him his parents were Cuban, defendant asked the officer about Cuban politics and compared Cuban politics to Mexican politics and corruption. Defendant spoke in a logical manner and the officer described the discussion as "a very nice conversation."

At some point after defendant was detained in the Sacramento County jail, Guadalupe went to visit him. During the conversation, defendant told her he had shot Maria because he had seen her with another man.

Maria denied she was dating anyone prior to the shooting. However, there was evidence that Maria had a male friend who spent time with her and the children in the weeks before the shooting.

**Defense Case**

Two psychiatrists testified in defendant's case, Dr. Humberto Temporini and Dr. Charles Schaffer. In forming their opinions, both relied primarily on jail records and jail mental health records reflecting defendant's behavior in custody.

The records reflected that, while in custody, defendant exhibited bizarre behavior, including: hitting his head against the wall; yelling for hours; openly masturbating; placing his face in the toilet; picking his skin; claiming his wife had put curses on him for two years; drooling his Kool-Aid on himself; staring at the ceiling; crawling "under the toilet" in an effort to dislodge it from the floor; and hyperventilating. He also exhibited

8

poor hygiene, appearing dirty, and smelling of urine.  He said he was hearing voices.  On November 30, 2008, defendant was admitted to the jail's psychiatric unit.  On four occasions in early December 2008, defendant was placed in four-point restraints as a result of his extremely agitated behavior.  He was in the psychiatric unit for 30 days, during which time he reported hallucinations and religious delusions.

Dr. Temporini, a Sacramento County jail psychiatrist, began treating defendant in January 2009.  He diagnosed defendant with schizophrenia, prescribed an anti-psychotic medication, and treated defendant for a year.  Over the year, defendant's symptoms improved.

Dr. Temporini recounted that symptoms of schizophrenia can develop very quickly and the symptoms can also develop slowly.  [] In the early stages of an episode, it may be possible to function in society while experiencing some symptoms.  Some people develop symptoms in a "very slow fashion" until it gets to a point where the symptoms are overwhelming and the person cannot keep going back to work or school or doing what they had been doing.  There is a lot of variability as to how people come to the very serious presentation defendant had at the jail.  However, Dr. Temporini offered no opinion on how defendant's symptoms had developed over time.

Dr. Temporini noted, that according to defendant's jail medical chart, defendant exhibited signs of having auditory hallucinations while at the jail.  He was internally preoccupied, not paying attention to anything else.  He was also observed talking to himself.  He had fairly serious religious delusions -- he believed "he had been in contact with the Virgin of [Guadalupe]" and that "God had told him that the earth [] was being cleansed."  Also, God had told him to bang his head against the wall until the devil told him to stop.

Dr. Temporini offered no opinion about defendant's mental condition at or around the time of the 2006 and 2008 attacks.  He did not indicate in his testimony that he asked

9

defendant to describe what had occurred during either episode or tested defendant's recollection about the events.

Dr. Charles Schaffer was appointed to conduct a court-ordered competency evaluation of defendant in May 2010. He did not diagnose defendant with a specific type of schizophrenia because defendant exhibited symptoms of more than one type, but noted that jail staff had diagnosed defendant the disorganized type of schizophrenia. Dr. Shaffer testified that the following are prominent for that type of schizophrenia: (1) disorganized speech; (2) disorganized behavior, which includes the failure to maintain hygiene and grooming; and (3) flat or inappropriate affect, which means that the person does not demonstrate much emotion, they do not laugh or show sadness, and they have "kind of a blank expression." Dr. Schaffer concluded, when defendant's schizophrenia is not "under adequate control" he engages in inappropriate behavior and experiences delusions, thought disorganization, hallucinations, and impaired executive function. Schaffer explained that impaired executive function means the person's ability to plan ahead, learn from experience, use good judgment, and make decisions is impaired. Defendant reported to Dr. Schaffer that at some point between the two attacks on his wife, he was involuntarily hospitalized in Los Angeles for walking around naked in public.[5]

Based on the jail records, Dr. Shaffer opined that defendant was suffering from active phase symptoms of schizophrenia between November 2008 and December 30, 2008. He too offered no opinion about defendant's mental condition at or around the time of the 2006 and 2008 attacks. And he did not indicate in his testimony that he asked

---

[5] Defendant was the sole source of this information and there was no independent corroboration of this involuntary commitment. Defendant did not tell Dr. Shaffer the dates he was treated in Los Angeles County, the specific place, or the names of any doctors there who had treated him, so Dr. Shaffer did not try to obtain medical records.

10

defendant to describe what had occurred during either episode or tested defendant's recollection about the events. However, defendant told Dr. Shaffer he was not experiencing any of the symptoms he had in the jail or in Los Angeles at the time he shot Maria. Defendant said those symptoms resumed after his incarceration at the jail.

Dr. Shaffer said that it is hypothetically possible for a person who has diagnosis of schizophrenia that is not controlled by medications to "not be recognized as being schizophrenic or having an episode" when "walking through a crowd of people." However, Dr. Shaffer also testified that it would not take a psychiatric health care professional to notice the active phase symptoms defendant had experienced in the jail if he had been experiencing those symptoms in society. He would not expect symptoms like those defendant exhibited in the jail from November 2008 to December 30, 2008 to go unnoticed by defendant's wife and children while he was living with them.

**Prosecution's Rebuttal**

Dr. Christopher Heard, a psychologist, also evaluated defendant pursuant to a court order and agreed, based on his review of the jail records and his May 2010 interview of defendant, that defendant was suffering from disorganized schizophrenia. It was in remission at the time Dr. Heard saw defendant. Dr. Heard noted from the jail records that while defendant was in the jail, defendant's thoughts and speech had previously been disorganized. He had engaged in tangential speech, jumping from one subject to another without any connection. He would be mute for extended periods of time. He was unable to take care of his daily needs; he was not showering or eating. He urinated on the floor and openly masturbated. He stuck his head and hands in the toilet. There were periods of extended screaming, and once in response to a question by a clinician, he turned to the wall and repetitively sang out the word "amore" for an extended period of time. Dr. Heard did not believe defendant was malingering because he presented fewer symptoms after taking medication. He noted that stress might cause

11

schizophrenic symptoms. The symptoms do not appear all of a sudden; rather there is usually a period of time -- a few days to weeks -- before the symptoms become severe.

Defendant told Dr. Heard that he had gone to Mexico for a number of months after the 2006 attack. He then went to Los Angeles in 2007 where he found work in a produce warehouse.

Defendant said after about seven months in Los Angeles, he began to hear voices telling him he was both God and the devil. The voices told him to walk naked in the streets. The police took notice and defendant underwent treatment for approximately a month.[6] Although defendant's memories of that commitment were vague, his memories of the 2006 and 2008 incidents were "clear" according to Dr. Heard. He did not report having any hallucinations or delusions at the time of either attack. Defendant reported he had received two separate phone calls before the December 2006 assault which led him to suspect his wife was having an affair. Dr. Heard acknowledged those calls could have been auditory hallucinations, but he did not believe the calls to be a hallucination or delusional because they were not consistent with the symptoms defendant shows when his actively psychotic. There was no religious or persecutory aspect like there was when he was in the jail. In addition, people who were around defendant around the time of the two attacks reported how defendant had been functioning and did not report any disorganization of defendant's thought processes, speech, or behaviors; they did not find anything remarkable about his behavior at all. Like Dr. Shaffer, Dr. Heard opined that defendant's family would have noticed the kinds of behaviors defendant later exhibited in the jail.

---

[6] Dr. Heard had no independent corroboration of this commitment either. Defendant had not told Dr. Heard where he had been hospitalized and could not remember names of the doctors who treated him.

12

As to the 2006 attack, Dr. Heard opined that defendant was experiencing a jealous fixation, rather than a delusion consistent with schizophrenia. And as to both the December 2006 and September 2008 assaults, based on defendant's description of the events and his conduct as reported by others, Dr. Heard opined defendant was not experiencing any active-phase schizophrenia symptoms at the time of the attacks.

## Verdicts and Sentencing

The jury found defendant guilty of all charges and found true all the enhancement allegations.

The court sentenced defendant to an aggregate term of 39 years to life, plus a consecutive four years, calculated as follows: on count one, seven years to life on attempted deliberate and premeditated murder plus a consecutive four years on the great bodily injury enhancement; and on count four, a consecutive seven years to life plus a consecutive 25 years to life for the firearm enhancement. The court imposed three year terms on each of the remaining counts, but stayed those sentences under section 654.

## DISCUSSION

### I. Instruction on Mental Illness and Attempted Murder

### A. Instructional Error Contention

Defendant contends the trial court had a sua sponte duty to instruct the jury that mental illness could negate deliberation and premeditation and make the crime attempted murder, because attempted murder is a "lesser included offense of attempted murder without premeditation."[7] Defendant argues the failure to so instruct put the jury in an

---

[7] Regarding mental disease, defect, or disorder, the court read the following version of CALCRIM No. 3428: "You have heard evidence that the defendant may have suffered from a mental disease, defect, or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent and/or mental state, specifically: the mental state of premeditation and deliberation for

13

"all-or-nothing position and effectively removed the option of the lesser offense." This argument is premised on defendant's claim that attempted murder is a lesser included offense of attempted deliberate and premeditated murder. The People, on the other hand, rely on *People v. Bright* (1996) 12 Cal.4th 652 (*Bright*) to support their argument that attempted murder is not a lesser included offense of attempted deliberate and premeditated murder. Defendant acknowledges that if *Bright* remains good law, the People are correct. But, he argues the Supreme Court has overruled its holding in *Bright*. It has not.

In *Bright*, the jury convicted the defendant of attempted murder, but could not reach a verdict on the allegation that the attempt was willful, deliberate, and premeditated. (*Bright*, *supra*, 12 Cal.4th at p. 658.) The issue before the court was whether principles of double jeopardy precluded retrial on the allegation. Our high court concluded the "provision in section 664, subdivision (a), imposing a greater punishment for an attempt to commit a murder that is 'willful, deliberate, and premeditated' does not create a greater degree of attempted murder but, rather, constitutes a penalty provision that prescribes an increase in punishment (a greater base term) for the offense of attempted murder." (*Bright*, *supra*, at pp. 656-657; see also *Anthony v. Superior Court* (2010) 188 Cal.App.4th 700, 705.) Thus, because attempted murder was not a lesser included offense of attempted willful, deliberate and premeditated murder, the conviction

---

Counts 1 and 4; and the specific intent for Counts 1 and 4; and the lesser included offense of attempted voluntary manslaughter within Counts 1 and 4; the allegation that the defendant used and intentionally and personally discharged a fire arm [*sic*], Penal Code Section 12022.53(c) and the allegation that the defendant used and intentionally and personally discharged a firearm proximately causing great bodily injury Penal Code Section 12022.53(d). If the People have not met this burden, you must find the defendant not guilty of Count 1, 4 or the lesser included offense with in [*sic*] Count 1 and 4 of attempted voluntary manslaughter or the allegation that the defendant used and intentionally and personally discharged a firearm, Penal Code Section 12022.53(c) or the allegation that the defendant used and intentionally and personally discharged a firearm proximately causing great bodily injury, Penal Code section 12022.53(d)."

14

on attempted murder did not constitute an acquittal on the penalty allegation and did not bar retrial on that allegation.

Following the United States Supreme Court's ruling in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*), the California Supreme Court reexamined *Bright*'s conclusion as to the nonapplicability of double jeopardy protections and held that after an appellate finding of evidentiary insufficiency concerning a finding that an attempted murder is willful, deliberate, and premeditated, double jeopardy protections preclude a retrial of the penalty allegation. (*People v. Seel* (2004) 34 Cal.4th 535, 539, 541 (*Seel*).) Nothing in *Seel* reexamined the underlying statutory analysis of *Bright*, however. Moreover, in its decisions since *Seel*, our high court has clarified that its holding in *Seel* is limited to the narrow issue of the application of double jeopardy principles to the retrial of the life sentence penalty allegation after a finding of evidentiary insufficiency. (*People v. Anderson* (2009) 47 Cal.4th 92, 107 [*Seel* did not completely overrule *Bright*; a retrial of the penalty allegation after a hung jury does not violate double jeopardy principles]; *People v. Izaguirre* (2007) 42 Cal.4th 126, 134 ["*Seel*'s interpretation of the scope of the holding in *Apprendi* pertained to an aspect of federal double jeopardy protection—protection against a second prosecution for the same offense after acquittal—that is not implicated in this case. [Citation.]"].)

The California Supreme Court has also clarified that the characterization of penalty or sentencing enhancements as the " 'functional equivalent' " of elements of greater offenses "means only that a defendant is entitled to have a jury determine whether those *facts* supporting an increased sentence have been proven beyond a reasonable doubt. The high court chose its language carefully and has expressed no intention to alter state law procedures that have no bearing on the jury trial right.… [¶] We recently rejected the notion that the high court's 'functional equivalent' statement requires us to treat penalty allegations as if they were actual elements of offenses for all purposes under state law. [Citation.]" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 137 (*Porter*)

15

["our double jeopardy holding in *Bright* remains good law despite intervening pronouncements of the United States Supreme Court" and "*Apprendi* does not control the statutory double jeopardy protection California provides in section 1023 when there has been no express or implied acquittal."].)

Although the California Supreme Court has repeatedly revisited the holdings of *Bright* and *Seel*, it has never retreated from the statutory analysis in *Bright* or the conclusion that attempted deliberate and premeditated murder is not a greater offense of attempted murder. To the extent that it has disapproved *Bright*, our high court has done so only in the context of the applicability of double jeopardy principles. Thus, for purposes of the right to jury determination of penalty allegation elements and cases involving determinations by a jury or court of evidentiary insufficiency and the applicability of double jeopardy principles to such cases, the penalty provision of section 664, subdivision (a), is the " 'functional equivalent' " of an element of the offense. However, the penalty provision of section 664, subdivision (a), is not the " 'functional equivalent' " of an element of the offense for all purposes. (*Porter*, *supra*, 47 Cal.4th at p. 137.)

After the briefing in this case was concluded our high court reaffirmed *Bright*'s holding that attempted murder is not divided into degrees and the deliberation and premeditation provision in section 664, subdivision (a), represents a penalty provision. (*People v. Favor* (2012) 54 Cal.4th 868, 876-877 (*Favor*); see also *People v. Chiu* (2014) 59 Cal.4th 155, 163 [noting the court in *Favor* distinguished the section 664, subdivision (a), penalty provision from the substantive crime of first degree murder on the ground that the latter involves a different degree of the offense].)

In *Favor*, our Supreme Court overruled this court's holding in *People v. Hart* (2009) 176 Cal.App.4th 662, a case defendant had relied upon as being "on all fours" with his case. In *Hart*, this court held the trial court was required to instruct the jury sua sponte that to find the defendant guilty of attempted willful, deliberate, and premeditated

16

murder as an aider and abettor under the natural and probable consequences doctrine, the jury had to find that attempted willful, deliberate, and premeditated murder, not just attempted murder, was a natural and probable consequence of the target offense. (*Hart*, at pp. 672-673.) Our high court expressly rejected *Hart*'s analysis and holding in *Favor*. (*Favor*, *supra*, 54 Cal.4th at pp. 879-880.) The *Favor* court wrote, "*Hart*'s analysis rested on the distinction between greater and lesser included offenses in general and on the general rule that a trial court has a duty to instruct on lesser included offenses if the evidence supports a conviction on the lesser offense. However, *Hart*'s reliance on the principles relating to lesser included offenses is inapplicable in light of *Bright*, *supra*, 12 Cal.4th 652…. Attempted premeditated murder is not a greater offense or degree of attempted murder. (*Bright*, *supra*, 12 Cal.4th at pp. 656-657, 668.) Thus, *Hart* incorrectly concluded that an actual perpetrator can be guilty of attempted premeditated murder, while the aider and abettor can be guilty of the lesser offense of attempted unpremeditated murder. [Citation.]" (*Favor*, at p. 879.)

Because attempted deliberate and premeditated murder is not a greater offense, the trial court here had no sua sponte duty to further instruct the jury on how to reach a verdict of non-deliberate and premeditated attempted murder. The instructions informed the jurors that mental illness could be considered as to each mental state, including intent to kill, deliberation, and premeditation; that is, the jury could consider defendant's mental impairment as to the mental state required for attempted murder *and* for the mental states of deliberation and premeditation. (CALCRIM No. 3428; see fn. 7, *ante*.) The instructions essentially informed the jury if the burden was not met as to deliberation and premeditation, it had to find the allegation not true. The jury was expressly instructed it could only consider the issues of deliberation and premeditation after it determined whether defendant was guilty of attempted murder. (CALCRIM No. 601.) Consistent with this instruction, the verdict forms appropriately set out the finding that the murder was willful, deliberate and premeditated as a special finding under the verdict for the

17

attempted murder counts along with the other enhancement findings. Because the jury would only have considered the issues of deliberation and premeditation, and the effect of any mental impairment on those issues, *after* it found defendant guilty of attempted murder, any findings as to deliberation and premeditation could not affect the determination of guilt as to the attempted murder. Thus, the jury was not placed in an "all-or-nothing" position. There was no instructional error.

## B. Harmless Error

Assuming the trial court had a duty to instruct that mental illness could negate the deliberation and premeditation required for the attempted murder penalty allegation, any error was harmless. We review for prejudice under the test in *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Beltran* (2013) 56 Cal.4th 935, 955 [error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof is reviewed for prejudice under the test in *Watson*].) Under *Watson*, " 'defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citation.]" (*Id*.) "Further, the *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*Id*. at p. 956.) As to both the 2006 and 2008 attempts on Maria's life, the evidence that the attempts were willful, deliberate, and premeditated was overwhelming.

### 1. The 2006 Attempted Deliberate and Premeditated Murder

Defendant had always been jealous and accused Maria of having an affair. He physically abused her and about five years into the marriage, he began making repeated

18

threats to kill her if she left for another man. All of this began long before the hammer attack in 2006.

During the week preceding the hammer attack, defendant told Maria he received a phone call from someone who said she was cheating on him. According to Maria, this was something defendant repeatedly told her. Defendant later told Leticia he received a call during the early morning hours prior to the attack from someone who said he was going to take Maria from him.

The hammer attack was not spontaneous. When defendant went to bed, he was wearing shorts. Just prior to the attack, he had dressed and was wearing a T-shirt and pants. The evidence showed the hammer he used was normally kept in the living room or kitchen closet with his other tools; thus, it can be reasonably inferred that defendant decided to obtain the weapon, did so, and brought it to the bedroom to carry out the attack. He attacked Maria when she was asleep and defenseless. After the attack, he fled the home, locking the door behind him (as most people do when leaving their home with children still inside), and then fled to Mexico.

Prior to the attack, defendant's behavior was described as normal or fine. Defendant's conduct in perpetrating the assault and fleeing the scene appeared to show organized thinking and goal directed behavior, not the kind of disorganized thought processes and impaired executive function characteristic of disorganized schizophrenia. None of the experts opined that defendant suffered from schizophrenia in 2006 or was undergoing any psychiatric issues before or during the 2006 attack. When describing this incident to the prosecution's expert, Dr. Heard, defendant did not mention experiencing any hallucinations or delusions. Nor did either of defendant's experts testify that defendant had mentioned experiencing hallucinations or delusions at the time of the 2006 attack. Dr. Heard opined defendant was not experiencing active-phase schizophrenia symptoms at the time of the attack. Moreover, Maria -- who had been married to defendant for 18 years -- testified she never knew defendant to suffer from mental illness.

19

Defendant did make statements about a monster and the devil to the couple's daughters, but these statements were not consistent. At some point while Maria was in the hospital, defendant told Guadalupe that he had been hallucinating and attacked Maria because he saw a *monster in her*. While he was living with Leticia in 2008, defendant told Mayra he saw a monster, but did not say where he saw the monster. But he told Blanca he had seen the *devil on Maria* and wanted to kill the devil. He also said Maria had been in a romantic relationship and the devil got involved. And he only told Jennifer in response to her question about why he attacked Maria that he had seen "something on the bed," and did not say what that "something" was or that he did anything to it.

On the other hand, as he had from the beginning of his marriage, he complained about Maria purportedly cheating on him when explaining why he attacked Maria. Defendant told Blanca he attacked Maria because she was seeing another man and that "jealous [*sic*] blinded" him. He also told Mayra that he attacked Maria because she was seeing another man on an occasion before he told her about seeing a monster. And he told Leticia, he was "pretty sure" Maria was cheating on him, he was "very frustrated," and complained that Maria "would get herself really made up every time she went out." Dr. Heard opined that defendant was experiencing a jealous fixation, not a delusion consistent with schizophrenia.

The evidence overwhelmingly showed defendant carried out his longstanding threat to kill Maria if she were to be unfaithful or leave him; miraculously, she survived.

### 2. The 2008 Attempted Deliberate and Premeditated Murder

Like his first attempt on Maria's life, the second attempt was a surprise attack. This time, defendant used a loaded gun to do the job. He hid behind the home where his wife was staying, confronted her, told her he was not going to share her with anyone else and that if he could not have her, no one would, and he would not rest until she was dead. Putting those words into action, he shot her three times.

The targeting of the gunfire showed his plan to make sure she would be with no one else. He shot her in the left chest in the vicinity of heart and when she attempted to flee, he shot her twice in the back of her neck near the base of the skull.

Prior to the shooting, he had made repeated threats to kill her if she did not reconcile with him. Similar to the first incident, defendant again fled the area. He arranged to stay at the home of a friend in Fresno and managed to drive there.

While in Fresno, he negotiated the sale of his vehicle. He conceived of a plan to get out of state and find work elsewhere. On the way to the bus station, he was acting normally. At some point after he left, he called and asked for the balance of the payment on his vehicle.

A month after the shooting and after defendant had been arrested, he was lucid and followed the directions of the officers who brought him back to California. He had what was characterized as a "very nice conversation" with one of the officers about Cuban and Mexican politics.

Before his arrest, defendant had told his friend that he attempted to kill his wife because she was cheating on him. While in the jail, he told Guadalupe he had shot Maria because he saw her with another man. He did not repeat the claim about seeing a monster.

None of the people who were around defendant prior to the shooting described observing him suffering from any of the characteristic symptoms of schizophrenia -- delusions, hallucinations (e.g., hearing voices when no one is around), disorganized speech,[8] grossly disorganized or catatonic behavior,[9] or negative symptoms such as inactivity, being abnormally socially withdrawn, or poor hygiene. Both Dr. Shaffer,

---

[8] Dr. Shaffer described disorganized speech as "means when the person talks they can't stay on subject."

[9] Dr. Shaffer described catatonic behavior as "being mute; they can't talk."

21

defendant's expert, and Dr. Heard, the prosecution's expert, opined that such behavior would have been noticed by those around defendant. According to Leticia, defendant was behaving normally earlier on the day of the shooting when he had lunch at her house.

Like the 2006 attack, defendant's conduct in perpetrating the 2008 shooting and fleeing the scene appeared to show organized thinking and goal directed behavior, not the kind of disorganized thought processes and impaired executive function characteristic of disorganized schizophrenia. Neither of defendant's experts testified that defendant was suffering from schizophrenia or symptoms relating to schizophrenia at or around the time of shooting. In fact, defendant told one of his experts that at the time of the shooting, he was not experiencing any of the symptoms he experienced in Los Angeles and that the symptoms only resumed after his incarceration in the jail after his arrest for the shooting. The prosecution's expert opined that defendant was not suffering from active-phase symptoms of schizophrenia on the day of the shooting.

Based on this evidence, we conclude it is not likely a reasonable jury would have found the evidence of deliberation and premeditation was lacking and returned an attempted murder conviction without a true finding on the penalty allegation even if the jury had been expressly instructed that it could find defendant guilty of non-deliberate and premeditated attempted murder if it found defendant did not deliberate and premeditate the attacks as a result of his mental health issues.

## II. Claim of Ineffective Assistance of Counsel

Defendant contends counsel was ineffective in failing to request an instruction that informed the jury it could consider his honest, but unreasonable, feeling of provocation in assessing whether the attempted murder was willful, deliberate, and premeditated. Defendant argues that the jury did not know it could convict of attempted murder without "premeditation" if it found defendant was "subjectively and honestly provoked" and "as a result of the provocation he acted rashly and his reasoning or judgment was impaired such that he did not premeditate." As a consequence of the absence of a modified

22

CALCRIM No. 522[10] or CALJIC No. 8.73,[11] the jury could have been misled into thinking it had only two options -- attempted deliberate and premeditated murder and attempted voluntary manslaughter -- rather than the three options that actually existed: attempted deliberate and premeditated murder, attempted murder, and attempted voluntary manslaughter.  In a similar argument, defendant also contends he was deprived of effective assistance of counsel by counsel's failure to request an instruction advising the jury it could consider evidence of his mental impairment in evaluating the subjective honesty of his claim of provocation sufficient to negate premeditation.[12]  The standards

[10]  CALCRIM No. 522 reads:  "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]"

[11]  CALJIC No. 8.73 reads:  "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

[12]  Although defendant does not proffer a specific pinpoint instruction on this point, presumably he has in mind a modified version of an instruction such as CALCRIM No. 627 or CALJIC No. 8.73.1.  CALCRIM No. 627 provides:  "A hallucination is a perception not based on objective reality. In other words, a person has a hallucination when that person believes that he or she is seeing or hearing [or otherwise perceiving] something that is not actually present or happening.  [¶]  You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation.  If the People have not met this burden, you must find the defendant not guilty of first degree murder."

CALJIC No. 8.73.1 provides:  "A hallucination is a perception that has no objective reality.  [¶]  If the evidence establishes that the perpetrator of an unlawful killing suffered from a hallucination which contributed as a cause of the homicide, you should consider

23

governing these claims and our analysis of the points are the same, so we will address these contentions together.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland's* high bar is never an easy task. [Citation.]' " (*Harrington v. Richter* (2011) 562 U.S. 86, __ [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].) To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, at p. __ [178 L.Ed.2d at p. 642].) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)

There is no need to address the issue of whether counsel's performance was deficient when we can dispose of an ineffective assistance of counsel claim on the grounds of lack of prejudice. (*In re Fields* (1990) 51 Cal.3d 1063, 1079.) Here, "[w]e need not determine whether the failure to request [a pinpoint] instruction was deficient because, even if it was, the failure to request the instruction did not prejudice defendant." (*People v. Smith* (2011) 198 Cal.App.4th 415, 428.)

Ignoring the overwhelming evidence of deliberation and premeditation, defendant focuses on the claimed inadequacies of the instructions as support of his contention that

that evidence solely on the issue of whether the perpetrator killed with or without deliberation and premeditation."

24

he was prejudiced by counsel's failure to ask for additional instructions. As we explain, the instructions as a whole were adequate and not misleading, and given the overwhelming evidence, it is not reasonably likely defendant would have obtained a different result had the jury been instructed as he now suggests on appeal.

Defendant argues the failure of defense counsel to request the pinpoint instructions was prejudicial because the instructions given were misleading, in that they " 'impliedly preclude[d]' the jury from considering provocation in determining whether premeditation exist[ed]" and did not fully instruct the jury on the defense theory of heat of passion. According to defendant, if the jury thought the provocation was insufficient to reduce the charge to attempted voluntary manslaughter, the instructions prevented the jury from giving consideration to heat of passion in determining the existence of deliberation and premeditation.[13] We disagree.

Defendant misplaces reliance on *People v. Valentine* (1946) 28 Cal.2d 121 to support his claim that the instructions here were misleading. As our high court noted in *Rogers*, *supra*, 39 Cal.4th at pages 879-880, *Valentine* required reversal because of "a host of instructional errors." In *Rogers*, the court acknowledged it had suggested in *Valentine* that the instruction on heat-of-passion voluntary manslaughter was misleading because the jury might have understood it to imply that provocation that was inadequate to reduce the murder to manslaughter was irrelevant to any other issue. (*Rogers*, at p. 880.) However, the *Valentine* court also faulted the trial court for blurring the distinction between first and second degree murder by erroneously instructing the jury that if the defendant possessed the requisite specific intent to kill for attempted murder,

---

[13] Defendant acknowledges that case law provides that a trial court does not have a sua sponte duty to give the instructions he now claims on appeal were essential to the jury's understanding of his defense. (See *People v. Rogers* (2006) 39 Cal.4th 826, 878-879 (*Rogers*); *People v. Middleton* (1997) 52 Cal.App.4th 19, 31-33, disapproved on other grounds in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752.)

25

the killing was first degree murder and further erroneously instructed the jury that defendant bore the burden of raising reasonable doubt as to the degree of murder. (*Valentine*, at p. 132.) It was this combination of instructional errors which required reversal in *Valentine*. (*Id*. at p. 134.)

In *Rogers*, a case defendant failed to address in his briefing, the court specifically rejected defendant's claim here. "*Valentine* does not stand for the general proposition that the standard heat-of-passion voluntary manslaughter instructions are always misleading in a homicide case where the jury is instructed on premeditated murder and there is evidence of provocation, or that such manslaughter instructions always must be accompanied by instructions on the principle of inadequate provocation set out in CALJIC No. 8.73. *In the absence of instructional errors such as were present in Valentine, the standard manslaughter instruction is not misleading*, because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder. Further, the manslaughter instruction does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed." (*Rogers*, *supra*, 39 Cal.4th at p. 880, italics added.)

In the instant case, nothing in the instructions precluded the jury from considering the evidence of provocation or mental impairment in determining whether defendant deliberated and premeditated. The jury was instructed that if it found defendant had the requisite intent to kill, it was then required to consider whether defendant deliberated and premeditated. Regarding deliberation, the jury was told, "[t]he defendant *deliberated* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." The jury was also instructed "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated." Regarding premeditation, the jury was told that "[t]he

26

defendant *premeditated* if he decided to kill before acting." Furthermore, the jury was also appropriately instructed on attempted voluntary manslaughter -- heat of passion. And the jury was also instructed to consider the evidence of defendant's mental impairment in determining whether he acted with the required mental states, specifically referencing deliberation and premeditation. These instructions adequately informed the jury that it could not find the penalty allegation true if it concluded defendant acted rashly, impulsively, or without careful consideration of the choice and its consequences. No reasonable juror would have understood otherwise. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1017.)

Moreover, the instructions defendant says trial counsel should have requested do not tell the jury that subjective provocation negates deliberation and premeditation. If the instruction had been given, the jury would merely have been told to consider the impact provocation *may have* had on deliberation and premeditation. For example, CALCRIM No. 522, tells the jury that, "[*t*]*he weight and significance of the provocation, if any, are for you to decide*" and "[i]f you conclude that the defendant committed murder but was provoked, *consider the provocation* in deciding whether the crime was first or second degree murder." (Italics added; see fn. 10, *ante*.) CALJIC No. 8.73, tells the jury that it "should consider" whether "provocation which played a part in inducing an unlawful killing" that is not sufficient to reduce the crime to manslaughter "for the bearing it *may have* on whether the defendant killed with or without deliberation and premeditation." (Italics added; see fn. 11, *ante*.)

Here, as reflected by the evidence we recounted in our harmless error analysis *ante*, defendant twice attacked his wife by catching her unaware -- first, while she was sleeping and second, by ambushing her after hiding in a shed -- because he thought she was seeing another man. He had always been a jealous man. Long before the first attempt to take his wife's life, he repeatedly threatened to kill her if she was with another man, and that is exactly what he tried to do twice.

There is no reasonable likelihood the jury would have reached a different verdict had the jury been instructed as defendant suggests on appeal.  (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d 171, at pp. 217-218.)  Defendant has failed to surmount " '*Strickland*'s high bar.' "  (*Richter*, *supra*, 562 U.S. at p. __ [178 L.Ed.2d at p. 642].)  Accordingly, we conclude defendant was not denied effective assistance of counsel.

## DISPOSITION

The judgment is affirmed.

      MURRAY      , J.

We concur:

     RAYE      , P. J.

     DUARTE      , J.